UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BRANDON LEWIS, et al.,

                    *Plaintiffs,*                    **MEMORANDUM OF LAW
                                                     IN SUPPORT OF MOTION FOR
                                                     A PRELIMINARY INJUNCTION**

                                                     6:20-CV-6316-CJS

          v.

ANDREW M. CUOMO, individually and
as Governor of the State of New York, et al.,

                    *Defendants.*

---

## STATEMENT OF FACTS

On March 2, 2020, apparently in response to the Coronavirus, the New York State

Legislature passed a bill amending Section 29-a of the Executive Law to increase the Governor's

powers to deal with a broad array of emergencies.  On information and belief, there was no

debate, no prior public notice, and no media coverage. The bill was rushed through in record

time with a message of necessity from the Governor and was signed into law by him the very

next day. Based on that process, the Legislature purported to give the Governor power to rule by

decree and the Governor has used that power to impose the greatest disruption in American

society and personal liberty since 1776.

The following language was added to the statute:

"The governor, by executive order, may issue  any directive during a state disaster
emergency declared in the  following  instances: fire, flood, earthquake, hurri-
cane, tornado, high water, landslide,  mudslide,  wind,  storm,  wave  action,  vol-
canic  activity, epidemic,  disease  outbreak, air contamination, terrorism, cyber
event, blight, drought, infestation, explosion, radiological accident, nuclear,

1

chemical, biological, or bacteriological release, water contamination, bridge failure or bridge collapse. Any such directive must be necessary to cope with the disaster and may provide for procedures reasonably necessary to enforce such directive."

On March 7, 2020, the Governor issued executive Order No. 202 and declared a state of emergency throughout the state until September 7, 2020. On March 16, 2020, the Governor issued Executive Order No. 202.3 which closed restaurants, gyms and movie theaters.

On March 18, 2020, the Governor issued Executive Order No. 202.5 which shut down malls and all places of public amusement. Executive Order No. 202.7 issued on March 19, 2020, closed all barber shops and hair salons, effective March 21, 2020, at 8:00 p.m. On March 20, 2020, the Governor issued Executive Order No. 202.8 which stated in part:

> "The provisions of Executive Order 202.6 are hereby modified to read as follows: Effective on March 22 at 8 p.m.: All businesses and not-for-profit entities in the state shall utilize, to the maximum extent possible, any telecommuting or work from home procedures that they can safely utilize. Each employer shall reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m. Any essential business or entity providing essential services or functions shall not be subject to the in-person restrictions. An entity providing essential services or functions whether to an essential business or a non-essential business shall not be subjected to the in-person work restriction, but may operate at the level necessary to provide such service or function. Any business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law."

Section 12 is a poorly drafted statute that contains vague references to prosecution for a misdemeanor or a felony. In its more lucid language, it allows those who violate an order to be fined $2,000 in a civil proceeding.

On March 23, 2020, the Governor issued Executive Order No. 202.10 which stated in part: "Non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other social events) are canceled or postponed at this time."

On March 27, 2020, the Governor issued Executive Order No. 202.11 which stated in part:

"During the period when an Executive Order limiting operation of a type of facility or limiting the number of persons who may occupy any space is in effect, any operation of such a facility or occupancy of any such space by more than the number of persons allowed by said Executive Order shall be deemed to be a violation of law and in particular, but not by way of limitation, shall be deemed to be a violation of the Uniform Code or other local building code in effect in the jurisdiction in which the facility or space is located. In the event of any such violation, any state, county, or local police officer authorized to enforce laws within the jurisdiction in which the space or facility is located is authorized to remove persons from such space or facility. In addition, in the event of such violation, any state, county, or local code enforcement official or fire marshal authorized to enforce the Uniform Code or other local building code within the jurisdiction in which the facility or space is located is authorized to issue an appearance ticket, a Notice of Violation, an Order to Remedy such violation, which shall require immediate compliance, and/or a Do Not Occupy Order to any owner, operator, or occupant of any such facility or space. Nothing in this provision shall limit the authority of any governmental unit or agency to take such other and/or additional enforcement actions to the extent necessary to ensure compliance with such occupancy-related directives or facility operation-related directives."

On March 30, 2020, the Governor issued Executive Order No. 202.13 which continued

Order Nos. 202.3, 202.4, 202.5, 202.6, 202.7 202.8, 202.10 and 202.11 until April 15, 2020. On

April 7, 2020, the Governor issued Executive Order No. 202.14 which stated in part:

"By virtue of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), all such Executive Orders shall be continued, provided that the expiration dates of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on April 29, 2020, unless later extended by a future Executive Order."

"The enforcement of any violation of the foregoing directives on and after April 7, 2020, in addition to any other enforcement mechanism stated in any prior executive orders, shall be a violation punishable as a violation of public health law section 12-b(2) and the Commissioner of Health is directed and authorized to issue emergency regulations. The fine for such violation by an individual who is participating in any gathering which violates the terms of the orders or is failing to abide by social distancing restrictions in effect in any place which is not their home shall not exceed $1,000." Exhibit "G".

On April 15, 2020, the Governor issued Executive Order No. 202.17 which stated in part:

> "Effective at 8 p.m. on Friday, April 17, 2020 any individual who is over age two and able to medically tolerate a face-covering shall be required to cover their nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance."

On April 16, 2020, the Governor issued Executive Order No. 202.18 which stated in part:

> "Any person utilizing public or private transportation carriers or other for-hire vehicles, who is over age two and able to medically tolerate a face covering, shall wear a mask or face covering over the nose and mouth during any such trip; any person who is operating such public or private transport, shall likewise wear a face covering or mask which covers the nose and mouth while there are any passengers in such vehicle. This directive shall take effect in the same manner as Executive Order 202.17, at 8 p.m. on Friday, April 17, 2020.

> "Executive Order 202.14, which extended the provisions of Executive Orders 202.3, 202.4, 202.5, 202.6, 202.7, 202.8, 202.10, 202.11, and 202.13 which each closed or otherwise restricted public or private businesses or places of public accommodation, and which required postponement or cancellation of all non-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations, games, meetings or other social events), is hereby continued, provided that the expiration date of such provisions of such Executive Orders shall be aligned, such that all in-person business restrictions and workplace restrictions will be effective until 11:59 p.m. on May 15, 2020, unless later extended by a future Executive Order. All enforcement mechanisms by state or local governments shall continue to be in full force a effect until May 15, 2020 unless later extended by a future Executive Order."

On May 7, 2020, the Governor extended the lockdown until June 6, 2020. Executive Order 202.28. At a press conference on May 11, 2020, the Governor stated that he was, effective May 15, 2020, delegating his emergency powers to regional committees and officials, who would then have vast discretion to continue any of his emergency decrees they believe are necessary. There is in fact much confusion about whether the Governor or his regional committees or law enforcement agencies who are in charge of interpreting and applying the regulations.  That being the case, it is essential that this Court issue injunctive and declaratory relief on an emergency basis to protect the rights of the business owner plaintiffs BRANDON LEWIS and LISA REEVES and

provide them with legal guidance so they can avoid arrest, harassment, prosecution and/or having their licenses revoked.

The chaotic and illegal redistribution of legislative powers to large numbers of unelected officials throughout the State has and will create hopeless confusion about which constitutional rights citizens can exercise at any given time and creates the grave risk of rampant corruption and favoritism and cronyism, such corruption being sharply correlated with arbitrary government power over the economy.

The legal ground is constantly shifting beneath the feet of the plaintiffs, requiring emergency injunctive relief. The Governor further stated on May 11th that any regional opening could be revoked at the discretion of regional officials.

The lockdown has been repeatedly extended and there is no assurance that it will not be extended again and again or modified but with numerous unlawful conditions violating the rights of the plaintiffs. Further, without the relief requested herein, the Governor could at any time reimpose the lockdown on flimsy evidence, on the basis of the virus, or any of the other ill-defined emergency conditions listed in the statute.

The combined effect of these unlawful orders (not the virus itself), replicated in numerous other states, has been the most massive violation of the liberty of American citizens in the history of the country, plunging the economy into near-depression status and leading to the expenditure of trillion of dollars borrowed, in effect, from young people and people yet to be born.

The failure to respect our constitutional rights has led to a catastrophe with no precedent in American history. This catastrophe is the direct result of the unconstitutional concentration of power into the hands of one highly fallible person, utterly unfamiliar with the facts on the ground, or with the unique circumstances of 19 million people, whose errors are then magnified

throughout the State in a manner that would be impossible if the Constitution's "diffusion of power" had not been flouted. F. A. Hayek, "The Use of Knowledge in Society," *The American Economic Review*, Vol. 35, No. 4. (Sep. 1945), pp. 519-530.

The Governor's unlawful lockdown of society and the economy, mirrored in most other states by their own governors, has devastated American society and its economy. The lockdown has not only caused an unprecedented disruption in American society but has forced the economy into near-Depression-era numbers. Over twenty million jobs have been lost and unemployment hit a record of over 14 percent. Over thirty-five million have filed for unemployment benefits. About 30 percent of small businesses have closed. There is a $3.7 trillion federal deficit, the highest since World War II and the federal debt has reached the $25 trillion mark. There are credible reports of increases in overdoses and suicides, and an increase in alcohol consumption (associated with a wide range of diseases). There are credible reports of people deferring needed medical care due to the lockdown.

It must be emphasized that the lockdown is a policy that explicitly sacrifices the young for the old given the huge disparity in how the virus affects each age group. Nothing like this has ever happened in American history.  The young are being deprived of their youth; their social life; their education; their sports; their arts; their graduations; their careers; their job market. This is wrong and indeed, cruel.

**ARGUMENT**

INTRODUCTION

*Legal Standard.*  A party seeking a preliminary injunction must "show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd*., 598 F.3d 30 (2nd Cir. 2010).

The coronavirus was and is being used by New York State and states around the country to usurp vast, unprecedented and virtually totalitarian power in violation of every known precept of American and republican constitutional law tradition dating far back into our British legal roots.

If this regime is allowed to stand, the courts would in effect be announcing that the American experiment of limited constitutional government based on delegated powers has failed and is finished, not only for this emergency in New York state, but with all future alleged emergencies in all states and with respect to the federal government.

If this health crisis, with an infection fatality rate somewhat higher than the flu, can justify the wholesale lockdown of society, then surely future emergencies of greater severity will justify essentially the total and complete control of all individual decisions until the crisis of the day, in the sole judgment of our leaders, is deemed to be over.

If this Court affirms this seizure of emergency powers in violation  of the Constitution, it would be in the odd position of erasing the Constitution while claiming the power to do so under that very same Constitution.

I.     **THE GUARANTEE CLAUSE REQUIRES THAT THE GOVERNOR'S EXECUTIVE ORDERS BE NULLIFIED**.

The Guarantee Clause is an important part of the Constitution that has been largely ignored for 200 years.  However, unusual times call for unusual remedies and it is time to dust off the Guarantee Clause and enforce it.  The clause states: "The United States shall guarantee to every State in this Union a Republican Form of Government. . ." Article IV.  It is facile to say that the term "republican" has no clear meaning.  In this context, the term has a very specific meaning that provides clear guidance for this lawsuit.  James Madison, the chief framer of the Guarantee Clause, defined a republic as follows in Federalist No. 39:

> "[W]e may define a republic to be, or at least may bestow that name on, a government which derives all its powers directly or indirectly from the great body of the people, and is administered by persons holding their offices during pleasure, for a limited period, or during good behavior."

The nation's founding document, the Declaration of Independence, speaks in simple terms: *"deriving their just powers from the consent of the governed."* Thus, the people, who are sovereign, delegate certain powers to the government by ratifying constitutions and the government may not exercise any greater powers, lest they cease being a republic, which, of course, triggers the right of revolution since the government that has seized power is a tyranny. The right of revolution was first propounded by Algernon Sydney, in his *Discourses Concerning Government* (1698).  Jefferson cited his influence:

> "the world has so long and so generally sounded the praises of his Discourses on government, that it seems superfluous, and even presumptuous, for an individual to add his feeble breath to the gale. They are in truth a rich treasure of republican principles, supported by copious & cogent arguments, and adorned with the finest flowers of science."  Letter to Mason Locke Weems, December 13, 1804.

Of course, the founders installed a constitution to avoid the need to take up arms.  In addition to

limiting the government to the powers delegated to it by the people in the constitution, Madison

also held that separation of powers is essential to republican government:

> "The accumulation of all powers, legislative, executive, and judiciary, in the same
> hands, whether of one, a few, or many, and whether hereditary, self-appointed, or
> elective, may justly be pronounced the very definition of tyranny."  Federalist No.
> 47.

In a brilliant dissent in *Mistretta v. United States,* 488 U.S. 361 (1989), Justice Scalia stated:

> "As John Locke put it almost 300 years ago, '[t]he power of the *legislative* being
> derived from the people by a positive voluntary grant and institution, can be no
> other, than what the positive grant conveyed, which being only to make *laws,* and
> not to  make *legislators,* the *legi*slative can have no power to transfer their
> authority of making laws, and place it in other hands." J. Locke, Second Treatise
> of Government 87 (R. Cox ed.1982) (emphasis added). Or as we have less
> epigrammatically said: 'That Congress cannot delegate legislative power to the
> President is a principle universally recognized as vital to the integrity and
> maintenance of the system of government ordained by the Constitution.' *Field v.
> Clark, supra,* 143 U.S. at 692."

 As Justice Harlan stated:

>  "'The true distinction . . . is between the delegation of power to make the law,
> which necessarily involves a discretion as to what it shall be, and conferring au-
> thority or discretion *as to its execution,* to be exercised under and in pursuance of
> the law. The first cannot be done; to the latter no valid objection can be made.'
> " *Id.,* at 693-694, 12 S. Ct., at 505 (emphasis added), quoting *Cincinnati, W. &
> Z.R. Co. v. Commissioners of Clinton County,* 1 Ohio St. 77, 88-89 (1852).

The people of the State of New York delegated the legislative power to the Legislature

only.  The Legislature's delegation to the governor of the power to issue directives exceeds that

delegation and also destroyed the separation of powers and thus violates the Guarantee Clause.

There are no cases concerning the Guarantee Clause that remotely resemble these facts:

that massive power was handed over to the Governor and utilized in an unprecedented manner to

lockdown an entire state, destroy its economy and trample upon numerous sacred constitutional

rights including public assembly, freedom of religion, the right to bear arms, due process and the

right to personal security under the Fourth Amendment.  This is therefore obviously a case of

first impression and no dicta from dissimilar cases bars this court from granting relief.  See, e.g.,

*Luther v. Borden,* 48 U. S. 1 (1849) (court would not decide which of two competing factions

was the legitimate government).  *Pacific States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912)

(Challenge to initiative and referendum nonjusticiable).  However, later cases suggest that not all

Guarantee claims are nonjusticiable.  See, *Bauers v. Heisel,* 361 F2d 581 (3rd Cir. 1966).

In the absence of relevant binding authority, and no prior cases remotely similar to this

one, the Court should consider the urging of analysts who have argued cogently for a

reinvigorated Guarantee Clause.  Arthur E. Bonfield writes:

> "It is difficult to conceive of injury resulting from federal protection of individual
> rights which are deemed basic to republican government. The states' capacity to
> function in those areas deemed by our federal system properly within their
> unreviewable aegis would in no way be weakened. To argue that such federal
> action would encroach on areas of traditional "state's rights," is only to highlight
> the inescapable fact that a federal union involves a delicate balance which is ever
> in a flux and process of adjustment. A conscientious and rigorous enforcement of
> the guarantee would not destroy federalism and its attendant virtues, but only
> adjust the delicate balance of powers that any such system involves. And that
> adjustment, by virtue of an enforcement of section 4, would solely be one of
> recognizing the paramount national concern with certain matters, and the
> attendant power of the federal government to deal with them. It would therefore
> seem extremely desirable to resurrect the guarantee as an instrument of national
> government. The salutary results that could be obtained from an application of its
> principles would greatly enhance the solution of many contemporary problems.
> Most of all, by curing the deficiencies of the fourteenth amendment, it would
> insure the fuller realization for all Americans of those basic precepts upon which
> our society rests."[1]

Thomas E. Berg is another commentator who urges modern use of the Guarantee Clause:

> "Application of a strengthened, though still flexible, nondelegation doctrine
> against state governments would satisfy Madison's concerns with deliberation and

---

[1] Bonfield, Arthur E., "The Guarantee Clause of Article IV, Section 4: A Study in Constitutional
Desuetude" 46 *Minnesota Law Review* 513, 571-572 (1962); see also, See J. ELY,
DEMOCRACY AND DISTRUST 240-41, n. 78 (1980) (arguing that guarantee clause imposes
nondelegation doctrine on the states).

accountability, and so give effect to the guarantee he advocated. As John Hart Ely has argued, enforcement of the nondelegation principle against the states is appropriate because policy making by elected officials is close to the "core meaning" of the guarantee clause.

*****

"The guarantee clause . . . embodies a more vigorous conception of republican government. This conception, identified particularly with Madison, relies on representative decision makers who, while accountable to the people, also bear a responsibility to deliberate in their decision making rather than respond mechanically to pressures from private groups. The guarantee of republican government can be interpreted as authorizing federal intervention to protect state governments from changes in form that would jeopardize the deliberative model. This substantive description of the guarantee clause compels strengthened judicial review in several related contexts of constitutional law. The principle supports a general limit on state delegation of legislative power to state agencies and particularly to private groups."[2]

## II.     THE GOVERNOR'S EXECUTIVE ORDERS VIOLATE THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT.

Due process has many familiar elements such as notice, an opportunity to be heard and an impartial tribunal.  There is, however, another essential element of due process that is more obscure because it rarely needs to be invoked: jurisdiction to issue lawful orders.  For example, if one of the plaintiffs had issued orders to Governor Cuomo, he would ask, what gives you the right?  That is exactly the question the plaintiffs wish to ask the Governor: what gives him the right to give us orders?  Since he has none, our due process rights have been violated.

As demonstrated in Point I, the Legislature may not delegate its lawmaking powers to the Governor since that power was not delegated to the Legislature by the People.  The People retain that power, subject to a future amendment of the state constitution (which has exactly zero

---

[2] "The Guarantee of Republican Government: Proposals for Judicial Review," 54 *Univ. Chicago L. Rev. 208, 233-34; 242.*

chance of being ratified).  Thus, the Governor's executive orders as complained of herein, were void ab initio, have no force of law and should be enjoined by this Court.  What Donald A. Dripps writes about federal nondelegation, applies here: "Individuals have a right-a 'liberty interest,' if you will-to protection against the exercise of legislative power except as the Constitution provides."[3]  The Supreme Court has stated: "the Due Process Clause provides that certain substantive rights -- life, liberty, and property -- cannot be deprived except pursuant to constitutionally adequate procedures."[4]

In this case, the procedures required are stated in the State Constitution: that a statute be passed by the Legislative in a deliberative process and not by executive decree.  Presently, citizens of New York are protected from injury by legislation due to the following procedural requirements:

1. The right to have no law "enacted except by bill."  NY Constitution, Art. III, §13.

2. Free debate in each house.  *Id*. at §11.

3. Various procedural requirement under §14.

4. Passage of the bill by the senate with a quorum requirement and a requirement to keep a record of its proceedings;

5. Passage of the bill by the assembly with a quorum requirement and a requirement to keep a record of its proceedings;

6. Surviving a veto by the Governor;

7. The ability to run for office or vote against the legislature in the next election in small districts.

---

[3] "Delegation and Due Process," *Duke L. J.* 657, 659 (1988).
[4] *Cleveland Board of Education v. Loudermill,* 470 U. S. 531 (1985).

Each of these rights was stripped away when the Legislature unlawfully delegated legislative power to the Governor.

There is no case directly on point, but, in our defense, it cannot be denied that the Governor of New York has never seized totalitarian power nor locked down the state before in its 244 years of existence.  We hope the defendants' attorneys will also be honest enough to admit that they have no case on point either.  It therefore falls to the Court to give life to the Constitution based on its plain meaning as enlightened by the crystal-clear background and history of the Constitution, starting with Magna Carta, cited at the beginning of the Complaint:

> "No free man shall be seized or imprisoned, or stripped of his rights or possessions, or outlawed or exiled, or deprived of his standing in any way, nor will we proceed with force against him, or send others to do so, except by the lawful judgment of his equals or by the law of the land."

The "law of the land" in this context is the New York State Constitution as quoted above.

Though rejecting the notion of the type of claim being made here (but with quite dissimilar facts), even Judge Richard Posner, the most cited legal scholar of all time, was forced to admit:

> "Delegation can violate due process in a quite elementary sense. If the state delegated to a mob the decision whether to punish a person for crime, there would be no doubt that due process had been violated."[5]

Give us an inch and we will take a mile.  Conceding that *some* delegations violate due process, Judge Posner allows us to assert that a delegation that invites the greatest intrusion into American liberty since 1607, also violates due process, OR NOTHING DOES!

---

[5] *United Beverage Company v. Indiana Alcoholic Beverage Commission,* 760 F2d 155 (7th Cir. 1985).

III.    THE GOVERNOR'S EXECUTIVE ORDERS VIOLATE SEVERAL
        SECTIONS OF THE BILL OF RIGHTS AND CONSTITUTION.

A.  THE GOVERNOR'S ORDERS VIOLATE THE FIRST AMENDMENT.

It is perfectly obvious that the Governor's orders explicitly violate numerous sections of

the First Amendment, particularly the ban on public and religious assemblies.  It is comical that

the Governor allowed numerous other mass meetings to occur, albeit with restrictions, such as

meetings at grocery stores, big box stores and liquor stores, while banning gatherings explicitly

protected by the First Amendment.  No lesser restricted options were considered or applied.

To obtain a preliminary injunction, Plaintiffs must show they will suffer irreparable harm

in the absence of the order. *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7, 20

(2008). The Supreme Court has recognized that "the loss of First Amendment freedoms, for even

minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S.

347, 373 (1976).

We expect the defendants to rely heavily on a *Lochner*-era case, *Jacobson v.

Massachusetts,* 197 U. S. 11 (1905).  Justice Holmes famously wrote about *Jacobson, "*The

principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian

tubes. *Jacobson v. Massachusetts*, 197 U. S. 11, 25 S. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765.

Three generations of imbeciles are enough."  *Jacobson* held, on the record before it—"its

application to the plaintiff in error"[6]--that the state could mandate a smallpox vaccine without

violating the Fourteenth Amendment's due process clause.  That case is not relevant here for

many reasons.  It deals with a dread disease not at issue here:

> "In 18th-century Europe, it is estimated 400,000 people per year died from the
> disease, and one-third of the cases resulted in blindness. These deaths included six
> monarchs. Smallpox is estimated to have killed up to 300 million people in the

---

[6] *Id*. at 39.

20th century and around 500 million people in the last 100 years of its existence. As recently as 1967, 15 million cases occurred a year."[7]

The case deals with a mandatory vaccine which is not at issue here.  It also deals with a statute, not illegal executive orders.  It does not address the First, Second or Fourth Amendments.  It heavily depends on centuries of predominant and informed opinion about smallpox, not a myriad of guesswork about a disease only identified a few months ago.  Finally, as odious as forced vaccination is, a complete societal lockdown is far worse.  For these reasons, *Jacobson* is of no relevance to this case whatsoever.

Last week, the Supreme Court denied a preliminary injunction against California's order that churches reduce their attendance to only 25 percent of capacity.  *South Bay United Pentecostal Church v. Gavin Newsom, Governor of California,* 590 U. S. _____ (May 29, 2020). That ruling is of no application here.  That case apparently did not challenge the orders under the Guarantee and due process clauses.  New York's restriction is far more severe by a factor of ten. Finally, no opinion was issued by the majority so the reasoning of the majority of the Court is unknown.

### B.  THE GOVERNOR'S ORDERS VIOLATE THE RIGHT TO BEAR ARMS.

As outlined in the complaint, the Second Amendment's right to bear arms has been violated by illegal executive orders.  Brandon Lewis's gun store was first shut down on threat of the loss of his license and more recently, is now forced to do business from his parking lot, reducing his business and damaging his security.

---

[7] Wikipedia.

The right to bear arms is a fundamental right and no longer should take a back seat to the other rights in the Bill of Rights.  It is, indeed, the most important right and the one the exercise of which triggered the American Revolution at Lexington and Concord.  It is the right that guarantees all the others.  It is a right, unlike free speech, the deprivation of which can result in violent death.  It is a right that allows citizens to protect themselves and, contrary to propaganda from those who favor a government gun monopoly, they do so many times each year.[8] It is the right that explains the long-term stability of the American Republic which unlike so many countries has avoided the numerous problems associated with a disarmed or unarmed population including: genocide, coups, civil wars, invasions and the shooting of unarmed protesters.[9]

The right is as important now as it has ever been as a check on government power in these times when politicians are using a pandemic as an excuse to grab massive power. It is also critical to allowing citizens to protect themselves when governments are releasing prisoners and reducing the number of arrests due to concern over the virus.  There are also millions of unemployed, creating a risk of increased criminal activity.  As I write this brief, riots have broken out in Buffalo, Rochester, New York City, Washington, D. C., Minneapolis, Los Angeles, Columbus, Louisville and Memphis in response to the police killing of George Floyd, a man laid off from his job due to the lockdown.[10]  Both currently, and throughout recent history, police agencies have proven to be notoriously bad at protecting citizens during riots.  In Los Angeles, during the Rodney King riots, they simply went AWOL, leading to the beating of Reginald

---

[8] See James Ostrowski, The Second Amendment Works (2020), published online at https://www.2awny.com/wp-content/uploads/2020/01/2A_Works_DRAFT_v5_1.18.20.pdf.
[9] Id.
[10] T. Richmond, "Who was George Floyd? Unemployed due to coronavirus, he'd moved to Minneapolis for a fresh start," *Associated Press* (May 28, 2020).

Denney.[11]  It is of the utmost life and death importance that this Court issue preliminary orders preserving and protecting the plaintiffs right to bear arms.

Proof of a Second Amendment violation suffices to establish irreparable harm.  See, e.g., Ezell v. City of Chicago, 651 F.3d 684, 699 (7th Cir. 2011).

### C.  THE GOVERNOR'S ORDER TO WEAR A MASK VIOLATES THE FOURTH AMENDMENT AND DUE PROCESS.

As previously argued, the Governor's executive orders are unlawful under the Guarantee and due process clauses of the Constitution.  See, Points I and II, above.  Accordingly, the Court should enjoin  enforcement of the Governor's mask order.  Additionally, The Fourth Amendment protects citizens from unreasonable bodily seizures and assaults: "[t]he overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." *Schmerber v. California,* 384 U.S. 757 (1966).

The requirement of wearing a mask in public is an unprecedented and massive intrusion into the security of persons and their physical integrity, dignity and health.  Masks interfere with breathing, can cause headaches probably from a buildup of carbon dioxide in the blood[12], can increase the risk of infections of various kinds[13] and interfere with speech, including speech in emergency situations where communication is vital.  One study concluded:

> "Oxygen concentration inhaled by healthy subjects wearing a surgical mask covering an N95 respirator decreases to about 17%, and the concentration of carbon dioxide increases to about 1.2% - 3% in a short period of light work (2-3). Although participants did not show any obvious changes in physical function and

---

[11] J. Wilson, LA Residents Arm Themselves Because 'Police Can't Protect You' With LA Riot'" apnews.com (May 14, 1992).

[12] E. Lim, et al, " Headaches and the N95 Face-Mask Amongst Healthcare Providers," *Acta Neurol Scand* (Mar. 2006), pp. 199-202.

[13] C. Baynes, "Coronavirus: Face masks could increase risk of infection, medical chief warns," *Independent.co.uk* (March 12, 2020).

did not have any discomfort ratings, the average carbon dioxide concentration inhaled was far higher than the limit of 0.1% of indoor carbon dioxide concentration in many countries. With prolonged mask wearing, untoward reactions may gradually appear. In another long-term study, after wearing an N95 mask for 12 hours the CO2 concentration of subjects increased to 41.0 mmHg, far higher than the baseline value of 32.4mm Hg at the beginning of the test (4). The subjects mainly reported headache, dizziness, feeling tired and communication obstacles. In real life, the situations and time of wearing masks are much longer than the above experimental research settings."[14]

There is little or no evidence that mandating the wearing of masks, in contrast to encouraging people to wear masks, has been a net benefit to society.  As with the massive and unprecedented intrusion into our First and Second Amendment and due process rights, this massive intrusion into our Fourth Amendment rights, requires its proponents to meet a very high burden of scientific proof they have not yet met.

### D. THE GOVERNOR'S ORDERS HAVE VIOLATED THE DUE PROCESS RIGHTS OF THE PLAINITFFS TO OPERATE A BUSINESS AND HAVE FAILED TO COMPESATE THEM FOR TAKING THEIR PROPERTY FOR A PUBLIC USE.

The due process clause of the Fourteenth Amendment is violated by Gov. Cuomo's Executive Orders that compel the closure of defendants' businesses (The Firing Pin, LLC and Big Red Barber Shop) and their continued hamstringing.  *See, Shelton v. Tucker*, 364 U.S. 479 (1960). United States Supreme Court precedents make clear that, even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

---

[14] Z, Zhaoshi, "Potential Risks When Some Special People Wear Masks," *Jamanetwork.com* (April 18, 2020).

The breadth of the abridgment must be viewed in the light of less drastic means for achieving the same basic purpose. See, *Lovell* v. *Griffin*, 303 U.S. 444 (the Court invalidated an ordinance prohibiting all distribution of literature at any time or place in Griffin, Georgia, without a license, pointing out that so broad an interference was unnecessary to accomplish legitimate municipal aims); *Schneider* v. *State*, 308 U.S. 147 (the Court dealt with ordinances of four different municipalities which either banned or imposed prior restraints upon the distribution of hand-bills).

In *Cantwell* v. *Connecticut*, 310 U.S. 296, the Court said that "conduct remains subject to regulation for the protection of society," but pointed out that in each case "the power to regulate must be so exercised as not, in attaining a permissible end, unduly to infringe the protected free-dom." 310 U.S., at 304.

## IV.    THE COURT SHOULD ENJOIN ANY ENFORCEMENT OF THE GOVERNOR'S EXECUTIVE ORDERS AGAINST ANY OF THE PLAINTIFFS HEREIN.

Because the Governor's orders are unlawful under both the Guarantee Clause (Point I), and the due process clause (Point II), the Court should enjoin their enforcement against the plaintiffs as requested in the eighth cause of action stated in the complaint.

## V.     THERE IS NO SCIENTIFIC, EMPIRICAL, PRACTICAL OR POLICY REASON WHY THE COURT SHOULD NOT ENJOIN ENFORCEMENT OF THE GOVERNOR'S ORDERS.

The case law requires that preliminary injunctions not be contrary to the public interest. We contend that the public interest in fact is furthered by this injunction as the centralization of power the enabling legislature has created has wreaked havoc on society and the economy that is irreparable by the malefactors.

The governor's unprecedented and unlawful abuse of power was not necessary to deal with the coronavirus outbreak and has caused much more harm than good.  There is no clear evidence that the lockdown worked in the narrow sense of measurably reducing illness and death:

> "Everyone will be exposed to severe acute respiratory syndrome coronavirus 2, and most people will become infected. COVID-19 is spreading like wildfire in all countries, but we do not see it—it almost always spreads from younger people with no or weak symptoms to other people who will also have mild symptoms. This is the real pandemic, but it goes on beneath the surface, and is probably at its peak now in many European countries. There is very little we can do to prevent this spread: a lockdown might delay severe cases for a while, but once restrictions are eased, cases will reappear. I expect that when we count the number of deaths from COVID-19 in each country in 1 year from now, the figures will be similar, regardless of measures taken."[15]

A study by a J. P. Morgan analyst found that "the vast majority of countries had decreased COVID-19 infection rates after national lockdowns were lifted."[16]

---

[15] "The Invisible Pandemic," *The Lancet* (May 5, 2020)*;* R. McMaken, "Do Lockdowns Work? Mounting Evidence Says No," *Mises.org* (May 20, 2020); see also, David Hart, "Pandemic Policy in One Page," *Aier.org* (May 29, 2020) (explaining why central planning on health matters works as badly as central planning on the economy and for similar reasons).

[16] T. Stickings, "Lockdowns failed to alter the course of pandemic and are now destroying millions of livelihoods worldwide, JP Morgan study claims," *DailyMail.co.uk* (May 22, 2020).

Enjoining enforcement of these orders will not disserve the public interest and in fact will begin to mitigate the harm the Governor has done and reduce the enormous taxpayers' expense for lawsuits for violations of civil and constitutional rights.  If an injunction is not issued and these massive violations of the rights of 19 million people are allowed to continue, the total potential exposure of the State could far exceed the current assets of a State that is already facing huge deficits, reduced revenues and a fleeing population.  An injunction would help rescue the State from the fiscal mess its leaders created.  A class action suit has already been filed against the State and others will surely follow.  If 19,000,000 citizens decide to sue the State for these massive violations of their rights, and each collected a mere $50,000, the bill would total $950,000,000,000.  An injunction now will drastically reduce the State's exposure and help protect its credit rating.

Ending the lockdown will begin to allow us to repair the massive damage it has caused to our economy and to our health:

> "The policies have created the greatest global economic disruption in history, with trillions of dollars of lost economic output. These financial losses have been falsely portrayed as purely economic. To the contrary, using numerous National Institutes of Health Public Access publications, Centers for Disease Control and Prevention (CDC) and Bureau of Labor Statistics data, and various actuarial tables, we calculate that these policies will cause devastating non-economic consequences that will total millions of accumulated years of life lost in the United States, far beyond what the virus itself has caused.

> "Statistically, every $10 million to $24 million lost in U.S. incomes results in one additional death. One portion of this effect is through unemployment, which leads to an average increase in mortality of at least 60 percent. That translates into 7,200 lives lost per month among the 36 million newly unemployed Americans, over 40 percent of whom are not expected to regain their jobs. In addition, many small business owners are near financial collapse, creating lost wealth that results in mortality increases of 50 percent. With an average estimate of one additional lost life per $17 million income loss, that would translate to 65,000 lives lost in the U.S. for each month because of the economic shutdown.

"In addition to lives lost because of lost income, lives also are lost due to delayed or foregone health care imposed by the shutdown and the fear it creates among patients. From personal communications with neurosurgery colleagues, about half of their patients have not appeared for treatment of disease which, left untreated, risks brain hemorrhage, paralysis or death."[17]

Ending the lockdown leaves the State and society with numerous and effective tools for dealing with the virus.  These include education, research, treatment, testing, deregulation to allow more testing, encouraging safe practices, encouraging the special protection of the vulnerable such as the elderly and those with compromised immune systems.  Private firms would be allowed vast discretion to impose conditions on customers and presumably those laws which mandate public accommodations could be suspended without violating constitutional rights.

Voluntary testing is the best method for stopping the spread of a virus that can be spread by asymptomatic persons.  "Since patients with asymptomatic COVID-19 were relatively concealed, the fact of viral shedding detected via nasopharyngeal swabs must not be ignored. Therefore, identifying and isolating patients with asymptomatic COVID-19 as early as possible is critical to control the transmission of COVID-19. Close contacts of patients with COVID-19 should be closely monitored to avoid secondary transmission."[18]  Because the government has a legal monopoly on testing, the failure to provide, or allow the free market to provide, a large supply of test kits or test opportunities, is entirely the fault of American government.  Testing worked in South Korea and Vò, Italy, as noted in the complaint and its value can be logically deduced as individuals have a strong incentive to determine if they have been infected and, if so,

---

[17]  S. Atlas, J. Birge, R. Keeney and A. Lipton, "The COVID-19 shutdown will cost Americans millions of years of life," *TheHill.com,* 05/25/20.

[18] R. Yang, et al., "Comparison of Clinical Characteristics of Patients with Asymptomatic vs Symptomatic Coronavirus Disease 2019 in Wuhan, China," *JAMA Network Open* (May 27, 2020).

to avoid infecting others for fifteen days.  Because of sheer governmental incompetence and negligence, the government contrived a situation where they argued that totalitarian power was the only alternative.  That is, of course a rank, fetid lie. Because there is a viable alternative to the lockdown, mass voluntary testing, the State has failed to establish that they exhausted every reasonable alternative to totalitarian lockdown.

If the Court were to grant this preliminary injunction, individuals would be perfectly free to (1) wear a mask; (2) avoid places where masks are not worn; (3) remain isolated; (4) exercise, take vitamin supplements known to be effective in boosting the immune system and get sufficient sun exposure to stimulate vitamin D production.[19]  Several risks factors for becoming severely ill from the virus have been identified and several of these are amenable to amelioration by individuals.  These include obesity, smoking, high blood pressure, and diabetes.[20]  Thus, lifting the lockdown leaves government, society and individuals with numerous and effective means for dealing with the virus, methods which have served humanity well for ages.

---

[19] See, A. Boretti and B. Banik, "Intravenous vitamin C for reduction of cytokines storm in acute respiratory distress syndrome," *PharmaNutrition* (April 21, 2020); K. Doheny, "More Vitamin D, Lower Risk of Severe COVID-19?," WebMD.com (May 18, 2020).
[20] See, CDC; "Covid-19: risk factors for severe disease and death," editorial, *BJM.com* (March 26, 2020).

## CONCLUSION

In the complaint, we warned about concentrating too much power in too few hands lest catastrophic errors be made through hubris.  Par. 79.  We even quoted Hayek who famously believed that no dictator could ever have enough knowledge of the complex workings of society to effectively run it.  Among other things, they lacked knowledge of the unique circumstances of each person.  The health emergency dictators never heard of a man named George Floyd and didn't know or care that he had lost his job due to the lockdown and was not in a good frame of mind on May 25, 2020:

> "Before he died after being pinned for minutes beneath a Minneapolis police officer's knee, George Floyd was suffering the same fate as millions of Americans during the coronavirus crisis: He was out of work and looking for a new job.
>
> "Floyd moved to Minneapolis from his native Houston several years ago in hopes of finding employment and starting a new life, said Christopher Harris, Floyd's longtime friend. But he lost his job as a bouncer at a restaurant when Minnesota's governor issued a stay-at-home order.
>
> "On Monday night, an employee at a Minneapolis grocery store called police after Floyd allegedly tried to pass a counterfeit $20 bill. In widely circulated cellphone video of the subsequent arrest, Floyd, who was black, can be seen on the ground with his hands cuffed behind his back while Officer Derek Chauvin presses him to the pavement with his knee on Floyd's neck. The video shows Chauvin, who is white, holding Floyd down for minutes as Floyd complains he can't breathe. The video ends with paramedics lifting a limp Floyd onto a stretcher and placing him in an ambulance."[21]

The central planners could not conceive of the stress, worry, depression and exhaustion that ordinary people would suffer from after months of being locked down for the first time in their lives or the lives of Americans in living memory.  They could not know how millions of unemployed and idle persons deprived of their normal pursuits and forms of solace would react to the tragic death of Mr. Floyd or how protests turned to riots and riots to carnage, racial unrest,

---

[21] T. Richmond, *supra.*

24

political instability, an assault on the White House and a cracked pane of Constitution-embossed glass at the Robert H. Jackson Courthouse in Buffalo, New York.

When we engage in radical and reckless experiments in casting aside constitutional standards and traditions of liberty that date back to Magna Carta, we take a great leap into the unknown like a gambler spinning the roulette wheel in Las Vegas.  Around and around and around she goes and where she stops, nobody knows.  It may not even be possible at this point to put this nasty new totalitarian Pandora back in her box, but we urge the Court to make a Herculean effort to do so before it is too late.

Dated:  Buffalo, New York
      June 4, 2020                          /s/ James Ostrowski
                                        James Ostrowski
                                        Attorney for the Plaintiffs
                                        63 Newport Ave.
                                        Buffalo, New York 14216
                                        (716) 435-8918
                                        jamesmostrowski@icloud.com